IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT S. BORTNER, INC.,               :     CIVIL NO. 1:05-CV-1625
                                       :
                    Plaintiff,         :     JUDGE SYLVIA H. RAMBO
                                       :
          v.                           :
                                       :
SHEET METAL WORKERS                    :
INTERNATIONAL ASSOCIATION              :
LOCAL UNION NO. 19,                    :
                                       :
                    Defendant.         :
                                       :

# M E M O R A N D U M

Before the court is Defendant's Motion to Confirm Arbitration Award
and in the Alternative Motion for Summary Judgment (Doc. 17).  The parties have
briefed the issues and the motion is ripe for disposition.  For the following reasons,
the court will grant the motion.

## I.      Introduction

### A.      Factual Background

This dispute arises out of a collective bargaining agreement between
the parties.  Plaintiff Robert S. Bortner, Inc. (hereinafter "Bortner") is a York,
Pennsylvania contractor.  Defendant Sheet Metal Workers' International
Association, Local Union No. 19 (hereinafter "the Union") is an unincorporated
labor organization located in Philadelphia, Pennsylvania.  The following facts are
undisputed except where noted.

On or about September 2, 1987, Bortner signed its first collective bargaining agreement with the Union. Bortner later joined the Sheet Metal Contractors' Association (hereinafter "SMCA") and authorized SMCA to bargain for and bind Bortner to a series of subsequent collective bargaining agreements with the Union. Bortner was still a member of SMCA when it negotiated the 2001/2004 collective bargaining agreement with the Union. The 2001/2004 collective bargaining agreement contained a Term of Agreement provision, Article XX, Section 1, that stated that the agreement covered the period from June 1, 2001 through May 31, 2004, "and shall continue in force from year to year after unless written notice of reopening is given not less than ninety (90) days prior to the expiration date."

Article II, Section 12 of the 2001/2004 collective bargaining agreement contained an authorization provision indicating that the employer recognized the Union as the exclusive bargaining representative of the majority of the employer's employees, "unless and until such time as the Union loses its status as the Employee's exclusive representative as a result of an N.L.R.B. election requested by the Employees." The agreement also set forth grievance procedures in Article XVIII, Section 8, providing in relevant part that:

> [i]n addition to the settlement of grievances arising out of interpretation or enforcement of this Agreement . . . any controversy or dispute arising out of the failure of the parties to negotiate a renewal of this Agreement shall be settled as hereinafter provided:
>
> (a) Should the negotiations for a renewal of this Agreement or negotiations regarding a wage/fringe reopener become deadlocked in the opinion of the Union representative(s) or of the Employer(s') representative(s), or both, notice to that effect shall be given to the National Joint Adjustment Board.

The provision then described the procedure for mediation, which provided ultimately that either party "may submit the dispute to the National Joint Adjustment Board," if initial efforts at conciliation fail. The grievance procedures provision then stated that "[t]he unanimous decision of [the National Joint Adjustment Board] shall be final and binding upon the parties."

In a letter dated February 16, 2004, Jeffrey W. Bortner, the President of Bortner, advised the Union that it no longer authorized SMCA to negotiate on its behalf and that it did not intend to renew the collective bargaining agreement with the Union. The Union and Mr. Bortner exchanged a series of letters from February 2004 through September of 2004 disputing whether Bortner had an obligation to renegotiate a new agreement with the Union.

On November 30, 2004, the Union filed an unfair labor practice charge with the National Labor Relations Board (hereinafter "NLRB") claiming that Bortner was refusing to bargain in good faith in violation of section 8(a)(5) of the National Labor Relations Act (hereinafter "NLRA").[1] An NLRB agent interviewed Mr. Bortner and told him that Bortner had an obligation to bargain with the Union. Mr. Bortner's counsel was present during the course of the NLRB interview. Bortner subsequently entered into negotiations with the Union; however, the parties dispute whether Bortner intended to bargain in good faith to form an agreement or only until he could walk away from such bargaining without reaching an agreement.

---

[1] Section 8(a)(5) provides that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a)(5). Section 9(a) of the NLRA, 29 U.S.C. § 159(a) provides for the designation of collective bargaining representatives by a majority of an employer's employees.

The first negotiation meeting between the parties was on January 21, 2005. The Union was represented by William Dorward, the Business Representative in charge of Bortner's geographic area, and Walter Fredericks, the Union's organizer for that area. Jeffrey Bortner, his wife, Donna Bortner, and his attorney, Charles Calkins, represented Bortner. The Union presented a proposed 2004/2007 collective bargaining agreement but the parties reached no agreement at that meeting. Although the parties agree that Bortner requested a non-competition clause, they dispute whether Bortner made an additional proposal regarding reduced wage rates and whether the Union was willing to discuss either request at that time.

The parties met for a second time on March 10, 2005 at Bortner's offices. The Union's legal counsel, Bruce Endy, and President Joseph Sellers, Jr., William Dorward, and Walter Fredericks represented the Union. Jeffrey Bortner, Donna Bortner, and attorney Charles Calkins represented Bortner. Bortner made the following proposals to the Union: 1) limit the collective bargaining agreement to York County only; 2) reduce the job reporting requirement from $5,000 jobs to $10,000 jobs; 3) eliminate the Market Recovery portion of the contract in its entirety; 4) change those references to the Association in the contract for Bortner; 5) prevent employees from requesting layoffs if they go to work for other employers; 6) insert the company hours for work of 7 to 3:30; 7) eliminate overtime except for over 40 hours per week; 8) eliminate bonus wages for forepersons; 9) eliminate clause dealing with shift work; 10) provide a $.50/hour raise; 11) establish Wednesday as payday; 12) change contract to provide for time worked as opposed to time paid; 13) eliminate severance pay provision on layoff; and 14) agree to a trade

4

secrets clause that would prohibit employees who leave from stealing the company's customers.

In response, the Union indicated that it could strike any reference to the SMCA because the new agreement would be a single-employer agreement between the Union and Bortner and that the grievance/arbitration procedure could be a single employer procedure.  Mr. Dorward acknowledged that the proposed hours were acceptable and would fit within the existing contract language.  Mr. Sellers tendered to Bortner a Residential/Light Commercial addendum in response to Bortner's wage rates concerns.  The addendum provided for reduced rates of pay and other concessions to the basic labor agreement for sheet metal workers who worked on residential and light commercial construction.  Although the Union indicated it would not agree to a trade secrets clause, it noted that the Pennsylvania Legislature had adopted the Uniform Trade Secrets Act the previous year.

No agreement was reached with respect to any aspect of the Union's proposed agreement from the first meeting.  The Union maintains that Bortner did not attempt to discuss that proposal, while Bortner indicates that he was prepared to agree to certain provisions but that the Union terminated the meeting before he could do so.  The parties adjourned the meeting and planned to meet again after Bortner had an opportunity to review the Residential/Light Commercial addendum.

The parties met for the third time on May 24, 2005.  Mr. Sellers, Mr. Dorward, and Mr. Freidrich attended for the Union and Jeffrey and Donna Bortner and attorney Charles Calkins represented Bortner.  Bortner indicated that it was not interested in the Residential/Light Commercial addendum and that it wanted to discuss a number of items that had been discussed at the second meeting.  Bortner

also wished to discuss a proposed non-competition clause where the Union would pay Bortner liquidated damages for employee violations and other major modifications to language that had been in the 2001/2004 collective bargaining agreement. Again the Union maintains that Bortner failed to express agreement to any provisions, while Bortner avers that it intended to, but the Union terminated the meeting before it could do so. The parties dispute whether the Union asked for a written copy of Bortner's additional proposals, but agree that Bortner did not give a written copy to the Union. Although the parties also characterize some other details from that meeting differently, they agree that Mr. Sellers terminated the meeting and that the parties had not reached an agreement.

Mr. Calkins subsequently wrote to Mr. Endy and asked the Union to consider four items: 1) a one year contract; 2) a non-disclosure agreement to be signed by all employees; 3) a 90-day probationary period for all employees during which employees would receive no benefits; and 4) working hours of 7 to 3:30 Monday through Friday. Mr. Endy responded on June 2, 2005 that the hours proposal was acceptable. However, Mr. Endy also advised Mr. Calkins that the Union intended to initiate the grievance procedure set forth in Article XVIII, Section 8 of the 2001/2004 collective bargaining agreement because it believed that negotiations were at an impasse.

On June 6, 2005, the Union initiated proceedings before the National Joint Adjustment Board (hereinafter "NJAB"). Bortner received notice and copies of the Union's submission. Bortner filed a responsive submission to the NJAB. The NJAB scheduled a hearing for June 28, 2005, but Bortner did not attend. On that date, the NJAB rendered its unanimous decision, requiring that the parties execute a

collective bargaining agreement that was identical to the 2004/2007 collective bargaining agreement negotiated between SMCA and the Union.

Bortner received a copy of the NJAB decision but did not implement it. The Union filed a grievance on July 27, 2005. The Local Joint Adjustment Board (hereinafter "LJAB") heard the grievance on August 15, 2005. Jeffrey Bortner and his counsel presented argument at that proceeding, maintaining that both the NJAB and the LJAB lacked jurisdiction. On September 9, 2005, the LJAB found that Bortner was bound to the decision of the NJAB and that compliance included providing an accounting of all work performed under the agreement and the payment of wages and fringe benefits based on the accounting.

Bortner has refused to implement the NJAB agreement or comply with the LJAB determination. From June 1, 2004 through December 31, 2005 Bortner performed 793.75 hours of sheet metal work within the scope of the Union's contract. The Union has calculated that Bortner owes the sum of $17,081.50 to the employee benefit plans for the hours worked.[2] The Union also maintains that an additional 5% is due for each month for which the employee benefit plan payments are delinquent, or $12,348.98, as of December 31, 2005. The court notes that Bortner disputes that it owes either the principal amount or the 5% interest under the employee benefit funds on jurisdictional grounds; Bortner does not dispute the work itself or that the calculations are incorrect.

---

[2] The relevant employee benefit funds include the Sheet Metal Workers' Local 19 Pension Fund, Welfare Fund, Annuity Fund, SUB Fund, Vacation Fund, Scholarship Fund, Joint Apprentice Fund, and the International Technical Institute (ITI), an International Union Apprentice Fund, calculated at an hourly rate of $21.52.

The parties also dispute whether Bortner owes an additional $1,926.04 for violating Article II, Section 4 of the imposed agreement by subcontracting 89.5 hours of work to the Williams Service company, a company that has no agreement with the Union and did not agree to apply the terms of the collective bargaining agreement to the work.  Bortner agrees that it subcontracted the hours to the Williams Service company, but denies that any money is owed because it disputes that Bortner was subject to an obligation under Article II or any other contractual provision.

Bortner also disputes whether there was a sufficient demonstration that a majority of its employees had designated the union as its collective bargaining representative.  The relevant undisputed facts are:  Bortner had about twelve employees in 1987; there is no clear record of how many employees Bortner had in 1988 specifically, but the company estimates that it had between 10 and 28 in the "late 1980's."; and between January 22 and March 28, 1998, twelve Bortner employees signed authorization cards for the Union to be their collective bargaining agent.

**B.     Procedural History**

Plaintiff commenced this action with a Petition to Vacate Arbitration Award in the Court of Common Pleas of York County on July 28, 2005.  Defendant removed the action to this court on August 11, 2005.  Defendant filed an answer and counterclaim on August 18, 2005, seeking confirmation of the arbitration award and specific performance.  Defendant filed the instant motion on February 14, 2006.

## II.    <u>Legal Standard</u>

The court will review the instant motion pursuant to the summary judgment standard.[3]  Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  "Moreover in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence." *Pollack v. City of Newark, N.J.*, 147 F. Supp. 35, 39 (D.N.J. 1956), *aff'd* 248 F.2d 543 (3d. Cir. 1957).

A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249.  The court must resolve all doubts as to the existence of a genuine

---

[3]  Defendants urge the court to consider their motion as a motion to confirm an arbitration award pursuant to Federal Rule of Civil Procedure 43(e), in conjunction with Rule 81(a)(3).  The court is not wholly convinced by Defendants' arguments that rule 43(e) supersedes application of the summary judgment standard under Rule 56.  It is not necessary for the court to spend time answering that question, as the summary judgment standard provides an adequate means for resolving the instant dispute.

Rule 81(a)(3) still comes into play because it releases the parties from the notice pleading requirements of Rule 8 and other procedural restrictions of the Federal Rules. *See Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 46 (2d Cir. 1994) ("Arbitration proceedings pursuant to the FAA are governed by the Federal Rules of Civil Procedure 'only to the extent that matters of procedure are not provided for' in the FAA. Fed. R. Civ. P. 81(a)(3).  Section 6 of the FAA provides that '[a]ny application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions . . . .' 9 U.S.C. § 6 (1988).").

issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial."  *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial."  *Celotex*, 477 U.S. at 322-23. " 'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.' "  *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

III.        **Discussion**

    A.        **Arbitrability**

The threshold inquiry before the court is whether the parties had an obligation to arbitrate.  The 2001/2004 collective bargaining agreement provided for arbitration in its grievance provisions.  However, Bortner maintains that § 8(f) of the NLRA applied to the instant circumstances and released Bortner from any obligations imposed by the 2001/2004 agreement when it expired.  The Union

argues that § 9(a) of the NLRA was applicable and imposed continuing obligations upon Bortner even after the expiration of the 2001/2004 collective bargaining agreement.  Thus, the Union maintains that because it is the collective bargaining representative of Bortner's employees, Bortner was required to negotiate a successor agreement and to participate in and be bound by any arbitration arising from those negotiations.  The court finds that the 2001/2004 collective bargaining agreement was valid, and that it, along with employee authorization cards, established that § 9(a) controls.  Accordingly, the court finds that Bortner had an obligation to negotiate a successor agreement and that the instant dispute was properly submitted to arbitration.

"[T]he question of arbitrability – whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance–is undeniably an issue for judicial determination." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  However, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *Id.*  "Finally, it has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *Id.* (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).

Bortner challenges the applicability of the collective bargaining agreement's arbitration provisions on the grounds that § 8(f) of the NLRA, 29

U.S.C. § 158(f),[4] rather than § 9(a), 29 U.S.C. § 159(a),[5] is controlling.  Where an employer has a relationship with a union under § 8(f), the employer has no obligation to bargain for a successor contract.  *Sheet Metal Workers' Int'l Ass'n Local 19 v. Herre Bros., Inc.*, 201 F.3d 231, 239 (3d. Cir. 1999).  "Section 8(f) differs [from § 9(a)] because it allows employers engaged primarily in the building and construction industry to enter into pre-hire agreements which contain union security clauses whether or not the union represents a majority of the employer's employees."  *Id.*  In a § 8(f) relationship, the union does not enjoy a presumption of majority status; thus "either party . . . is free to unilaterally withdraw and 'avoid any obligation to bargain for a successor contract' upon the expiration of the collective bargaining agreement."  *Id.* (quoting *James Luterbach Constr. Co.*, 315 N.L.R.B. 976, 979 1994 WL 715997 (1994)).  The only exception to the freedom to

---

[4] Section 8(f) provides:

It shall not be an unfair labor practice . . . for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . . because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement . . . *Provided* . . . That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

29 U.S.C. § 158(f).

[5] Section 9(a) provides:

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ."

29 U.S.C. § 159(a).

unilaterally withdraw is where an employer is " 'part of the multiemployer unit prior to the dispute' and 'has, by a distinct affirmative action, recommitted to the union that it will be bound by the upcoming or current multiemployer negotiations.' " *Id.* at 240. (quoting *Luterbach*, 315 N.L.R.B. at 980.)

It is well established that § 9(a), on the other hand, in conjunction with § 8(a)(f), creates an obligation for an employer to negotiate with a union in good faith only if the union has been "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." *Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 533 (D.C. Cir. 2003) (internal quotations omitted); *see also Herre Bros. Inc.*, 201 F.3d at 239. Because the union enjoys a presumption of majority status under § 9(a), "neither an employer nor a union governed by § 9(a) may unilaterally withdraw from the multiemployer bargaining unit or the collective bargaining agreement; instead withdrawal is subject to specific requirements." *Herre Bros, Inc.*, 201 F.3d at 239.

Thus, "an employer must continue bargaining with a section 9(a) union after the expiration of the agreement unless the company can demonstrate either that the union has in fact lost majority support or that the employer has a 'good faith uncertainty' as to the union's status." *Id.* at 534; *see also Herre Bros, Inc.*, 201 F.3d at 239. Contract language alone is insufficient to establish the existence of majority support. *Nova Plumbing, Inc.*, 330 F.3d at 536-37. However, majority support may be shown "through the presentation of employee authorization cards to an employer." *Herre Bros., Inc.*, 201 F.3d at 241. In addition, union claims of majority support that have gone unchallenged for more than six months have also been deemed sufficient. *Id.*

13

The undisputed record before the court establishes that the 2001/2004 collective bargaining agreement was a valid and binding contract between Bortner and the Union.  Bortner joined SMCA shortly after it entered into its first collective bargaining agreement with the Union in 1987 and authorized SMCA to negotiate subsequent contracts with the Union on Bortner's behalf.  Bortner's February 9, 2001 letter authorized SMCA to negotiate on its behalf and expressly stated that Bortner would be bound by contracts that SMCA negotiated pursuant to that authority.  SMCA subsequently negotiated the 2001/2004 collective bargaining agreement.  Moreover, Bortner's notice to SMCA and the Union that it no longer authorized SMCA to bargain on its behalf indicated that such an arrangement became effective when the 2001/2004 agreement expired.  Accordingly, the 2001/2004 was a binding and valid agreement between Bortner and the Union.

The court does not decide here whether Bortner at some point had a valid oral agreement that Bortner could terminate its relationship with the Union by giving 30 days notice or whether Bortner's initial agreement with the Union was the result of coercion.  Even if the court assumes those facts to be true, the subsequent written agreements were validly negotiated by SMCA on Bortner's behalf.  Those agreements, including the 2001/2004 collective bargaining agreement, establish the termination provisions and negotiation requirements presently at issue.

Bortner attempts to attack the applicability of the 2001/2004 grievance provisions on the grounds that the Term of Agreement provision, Article XX, states that the contract only remained in effect "until conferences relating [to successor contract negotiations] have been terminated by either party."  Bortner claims that the Article XVIII, Section 8 requirement to arbitrate following an impasse in

negotiations is inconsistent with the Term of Agreement provision.  The court rejects this argument, noting that the Supreme Court has held that "the arbitration clause of a collective bargaining agreement survives contract termination unless the parties indicate a contrary intent, either expressly or by clear implication."  *United Steelworkers of America v. Fort Pitt Steel Casting Division-Conval-Penn Inc.*, 635 F.2d 1071, 1075 (3d Cir. 1980) (citing *Nolde Bros., Inc. v. Local 358, Bakery & Confectionary Workers*, 430 U.S. 243, 255 (1977)).  The 2001/2004 collective bargaining agreement contains no express or implied intent for the arbitration provisions to terminate upon expiration of the contract.  Rather, the provisions specifically provide for arbitration when negotiations reach an impasse. Accordingly, the court finds that the arbitration provisions are not nullified by the Term of Agreement provision.

Bortner also argues that the Union improperly submitted the negotiations to arbitration because the Union failed to engage in good faith negotiations to the point of impasse.  The language of the 2001/2004 collective bargaining agreement renders Bortner's reliance upon *Saunders House v. NLRB*, 719 F.2d 683 (3d Cir. 1983) inapposite.  The 2001/2004 agreement expressly provides that if negotiations deadlock "*in the opinion of* the Union representative(s) or of the Employer(s') representatives, or both, notice to that effect *shall* be given to the National Joint Adjustment Board."  The provisions also expressly provide for NJAB determinations from that point forward regarding the state of negotiations and the required arbitration form and procedure.  The undisputed facts establish that the Union's actions fell within the scope of conduct contemplated by the provisions for initiating arbitration.  The court will not engage in a merits analysis regarding

15

whether an impasse was reached where, as is the case here, the parties agreed in advance that the NJAB would make that determination.

Finally, the court finds that the contract language plus the employee authorization cards establish that § 9(a) of the NLRA governs the relationship between Bortner and the Union. There is no conclusive record of the exact number of Bortner's employees during the early months of 1988 when the twelve employees signed the authorization cards; Bortner estimates only that it had anywhere from 10-28 employees during the late 1980's. However, the 2001/2004 collective bargaining agreement expressly states that

> [i]nasmuch as the Union has demanded recognition from the Employer as the exclusive bargaining representative of the Employer's Employees in the bargaining unit described herein under Section 9(a) of the National Labor Relations Ace, and has submitted proof thereof in the form of signed and dated authorization cards, and the Employer is satisfied that the Union represents a majority of its Employees in the bargaining unit described herein, the Employer hereby recognizes the Union as the exclusive collective bargaining representative of its Employees on all present and future job sites within the jurisdiction of the Union, unless and until such time as the Union loses its status as the Employee's exclusive representative as a result of an N.L.R.B. election requested by the Employees.

Thus, any dispute over the specific number of employees is not material to the issue of whether a valid § 9(a) relationship existed because the cards, taken in conjunction with the explicit contract language, clearly establish that the Union was the majority representative of Bortner's employees and that Bortner recognized the Union as such. Moreover, the undisputed facts fail to establish that there was a valid or successful employee election to terminate the Union's representation.[6] Therefore, §

---

[6] Bortner's response to the Union's submission to the NJAB indicated that a decertification
(continued...)

9(a) was controlling when the 2001/2004 collective bargaining agreement expired. Accordingly, the parties were required to try to negotiate a successor agreement and were bound by the arbitration provisions when negotiation attempts failed.[7]

## B.   Legitimacy of Arbitration Award

Having determined that the collective bargaining agreement was valid and permissibly obligated the parties to arbitrate, the court is restricted in its review of the arbitration award.  As noted above, the court may not address the merits of the underlying claims.  *AT&T Techs, Inc.*, 475 U.S. at 649-50.  Under Pennsylvania law, the court may not vacate an arbitration award unless "it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption or other irregularity caused the rendition of an unjust, inequitable or unconscionable award." 42 Pa. Cons. Stat. Ann. § 7341.  Moreover, the court must vacate an award if "there was no agreement to arbitrate and the issue of the existence of an agreement to arbitrate was not adversely determined [in court proceedings to compel or stay arbitration] and the applicant-party raised the issue of the existence of an agreement to arbitrate at the hearing." 42 Pa. Cons. Stat. Ann. § 7314.

However, "an award is legitimate only so long as it draws its essence from the collective bargaining agreement.  When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S.

---

[6] (...continued)
petition was filed on June 17, 2005.  The petition was denied.

[7] Bortner's attempt to invoke a "one-man unit" exception to collective bargaining obligations imposed under § 8(a)(5) of the NLRA are inapposite because the case law cited by Bortner discusses the exception only in the context of § 8(f) cases. *See J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers, Local Union 1*, 398 F.3d 967 (7th Cir. 2005).

593 U.S. 593, 597 (1960).  Only in such rare instances will a court set aside an arbitrator's interpretation of a collective bargaining agreement.  *Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000).

After the June 28, 2005 arbitration hearing, the NJAB issued a unanimous decision that the parties were to execute a collective bargaining agreement identical to the 2004/2007 collective bargaining agreement between SMCA and the Union.  The fact that the decision was unanimous is consistent with the requirements found in the 2001/2004 collective bargaining agreement grievance provisions.  Moreover, requiring compliance with a collective bargaining agreement similar in form and substance to prior agreements between the parties and identical to the agreement signed by SMCA on behalf of a number of other employers neither suggests an unjust, inequitable, or unconscionable award nor establishes that the award does not draw from the essence of the 2001/2004 collective bargaining agreement.  Finally, Bortner was not denied a hearing and nothing in the record establishes fraud, misconduct, corruption, or other irregularity.  Therefore, the court may not vacate the NJAB award.

Similarly, the grievance submitted to the LJAB was in accordance with the grievance procedure under the imposed 2004/2007 collective bargaining agreement.  Bortner and his attorney participated in that hearing.  Although they challenge the jurisdiction of the LJAB, along with that of the NJAB, neither Bortner nor the facts suggest that the proceedings were otherwise tainted by fraud, misconduct, corruption, or other irregularity.  The LJAB award, which was also unanimous, was based on the language of the 2004/2007 collective bargaining agreement and the required accounting further assured that the LJAB decision would

draw from the essence of those contractual provisions. The court may not vacate the LJAB award. Accordingly, Bortner is bound by the September 9, 2005 LJAB decision, as well as the June 28, 2005 NJAB decision.

## C.  Enforceability of Permissive Subjects of Bargaining Provisions in Imposed Agreement

In addition to the arguments discussed above, Bortner challenges the arbitration provision and its ability to bind Bortner on the grounds that the impasse arose out of nonmandatory subjects and the imposed agreement contained provisions governing such nonmandatory subjects. Mandatory subjects of collective bargaining include "Wages, hours, and other terms and conditions of employment." *Sheet Metal Workers Local Union No. 54 v .E.F. Etie Sheet Metal Co.*, 1 F.3d 1464 1473 n.10 (5th Cir. 1993) (citing 29 U.S.C. § 158(d); *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203 (1965)). "[A]n interest arbitration clause cannot be invoked solely because of an impasse over a nonmandatory subject of bargaining"; however, where the disputed issues go beyond nonmandatory subjects, a party may "invoke interest arbitration even if [the] negotiations [leave] some nonmandatory issues unresolved." *Id.* Here, the parties failed to reach agreement regarding any aspect of a proposed new agreement. Clearly then the fact that mandatory subjects were disputed provided a permissible basis for the Union to invoke the arbitration clause.

However, to the extent that Bortner challenges the inclusion of nonmandatory subject provisions in the imposed 2004/2007 agreement, both parties agree that such provisions are not enforceable.[8] The court agrees. Nonmandatory

---

[8] The parties do not discuss at length which portions of the collective bargaining agreements

(continued...)

provisions in NJAB awards are unenforceable.  *Id.* at 1476; *see also NLRB v. Sheet Metal Workers Int'l Ass'n, Local Union No. 38*, 575 F.2d 394, 398 (2d Cir. 1978) (holding that "an interest arbitration provision of a collective bargaining agreement is void as contrary to public policy, insofar as it applies to nonmandatory subjects").

This finding that provisions on nonmandatory subjects are unenforceable does not provide a ground to invalidate the 2001/2004 arbitration provision or the arbitration awards though.  Both the 2001/2004 and imposed 2004/2007 collective bargaining agreements contain severance provisions that preserve the validity of remaining contractual provisions when specific provisions are found to be unenforceable.  In order to find that severance under such provisions is inappropriate and invalidate an entire award, "extraordinary circumstances" must exist.  *Id.*  Because the court does not find extraordinary circumstances here it will not invalidate the awards of the NJAB and the LJAB.

---

[8](...continued)
constitute nonmandatory subject.  However, Defendant provides a list of proposed excluded provisions in its proposed order, which includes the provision requiring interest arbitration upon expiration of the agreement, the provision requiring the company to post a bond to cover payment of wages or fringe benefits, and the portion of the agreement requiring the company to make contributions to an industry advancement fund.

**IV.**       <u>**Conclusion**</u>

          For the foregoing reasons, the court will grant Defendant's motion, which it considered pursuant to the summary judgment standard.  An appropriate order will issue.

                                        <u>s/Sylvia H. Rambo</u>
                                        SYLVIA H. RAMBO
                                        United States District Judge

Dated:  April 13, 2006.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT S. BORTNER, INC.,       :       CIVIL NO. 1:05-CV-1625

     Plaintiff,       :       JUDGE SYLVIA H. RAMBO

     v.       :

SHEET METAL WORKERS       :
INTERNATIONAL ASSOCIATION       :
LOCAL UNION NO. 19,       :

     Defendant.       :

**O R D E R**

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT**

1) Defendant's Motion to Confirm Arbitration Award and in the Alternative Motion for Summary Judgment (Doc. 17) is **GRANTED** in part and **DENIED** in part;

2) Defendant's request that the court order Plaintiff to comply with the arbitration award of the National Joint Adjustment Board dated June 28, 2005 and the decision of the Local Joint Adjustment Board dated September 9, 2005 is **DENIED** insofar as Plaintiff is not required to comply with the following provisions of the 2004/2007 collective bargaining agreement: the provision requiring interest arbitration upon expiration of the agreement; the provision requiring the company to post a bond to cover payment of wages or fringe benefits; and the portion of the agreement requiring the company to make contributions to an industry advancement fund;

3) Defendant's request that the court order Plaintiff to comply with the arbitration award of the National Joint Adjustment Board dated June 28, 2005 and the decision of the Local Joint Adjustment Board dated September 9, 2005 is hereby **CONFIRMED** in all other respects and the Plaintiff Robert S. Bortner, Inc. is ordered to specifically perform its collective bargaining agreement with Defendant Sheet Metal Workers' International Association, Local Union No. 19 as ordered by the National Joint Adjustment Board and the Local Joint Adjustment Board.

4) Plaintiff shall pay to Defendant the aggregate sum of the amounts due for payments to the employee benefit plans, liquidated damages for delinquency in making those payments, and for subcontracting of sheet metal work in breach of its agreement with Defendant as of the date of this Order;

5) The Clerk of Court is directed to enter judgment in accordance with the above portion of this order; and

6) The Clerk of Court is directed to close the file.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  April 13, 2006.